742 S.E.2d 108

**STATE of West Virginia, Plaintiff Below, Respondent**

v.

**Jack JONES, Defendant Below, Petitioner.**

No. 11–1504.

Supreme Court of Appeals of West Virginia.

Submitted March 26, 2013.

Decided April 11, 2013.

Stephen D. Herndon, Esq., Herndon Law
Offices, Wheeling, West Virginia, Brent A.

Clyburn, Esq., The Law Office of Brent A. Clyburn, Wheeling, WV, for Petitioner.

Patrick Morrisey, Esq., Attorney General, Scott E. Johnson, Esq., Senior Assistant Attorney General, Charleston, WV, for Respondent.

PER CURIAM:

This case is before this Court upon the appeal of Jack Jones from his convictions in the Circuit Court of Ohio County of six counts of sexual assault in the first degree, seven counts of sexual abuse by a custodian or parent and one count of conspiracy. All of the convictions represented acts of sexual misconduct perpetrated by Jones against a child, R.M.[1] According to the evidence of the State, Jessica M., the mother of R.M., participated with Jones in some of the acts of sexual misconduct against R.M. Jessica M.'s criminal convictions concerning R.M. were affirmed by this Court in *State v. Jessica Jane M.*, 226 W.Va. 242, 700 S.E.2d 302 (2010).

Following trial by jury in 2009, the circuit court entered an order denying Jones's post-trial motions and sentencing him to an aggregate penitentiary term of 161 to 355 years. The circuit court reimposed that sentence by order entered on September 30, 2011.

Asking for a new trial, Jones sets forth several assignments of error, among which is his contention that his confrontation and due process rights were violated because he was not permitted to let the jury know that the complaining witness, R.M., had made various statements that sexual misconduct had been perpetrated against her by individuals other than Jones. Jones asserts that evidence of R.M.'s statements implicating others should have been admitted at trial as an exception to this State's rape shield statute, *W.Va. Code*, 61–8B–11 [1986].

In reviewing Jones's assignments of error, this Court has carefully examined the appendix-record and the briefs and argument of the parties. For the reasons stated herein, we find the assignments of error to be without merit. Accordingly, this Court affirms Jones's convictions as well as his penitentiary sentence reflected in the September 30, 2011, order.

## I. Factual Background

R.M., born in December 1998, is the biological daughter of Jessica M. The biological father has been absent from this State for some time and is not involved in this case. In 2001, Jessica M. began a relationship with the petitioner, Jack Jones, an adult male born in 1970. Jones lived at Jessica M.'s residence in the Wheeling area from time to time and is the putative father, with Jessica M., of two children, Molly, born in 2003, and Isaac, born in 2005. Throughout the relationship between Jessica M. and Jones, drug and alcohol abuse and domestic violence took place at the residence in the presence of the children. As a result, the circumstances necessitated the continued involvement of the West Virginia Department of Health and Human Resources and its office of Child Protective Services.

In 2006, the Department of Health and Human Resources instituted abuse and neglect proceedings in the Circuit Court of Ohio County against Jessica M. and Jones on grounds unrelated to the sexual misconduct charges underlying this appeal. One of the primary allegations in the abuse and neglect proceeding was that, while under the influence of an illegal substance, Jessica M. drove away in a vehicle, leaving one of the infant children, age two, on the sidewalk. Soon after, R.M., Molly and Isaac were placed in foster care. The record indicates that Jessica M.'s parental rights to R.M. were terminated in November 2007.

At age seven, R.M. entered the foster home of Sally Keefer and was seen exhibiting age-inappropriate sexual knowledge and sexual conduct, such as "French kissing." Soon after, R.M. told Ms. Keefer that she had been sexually abused by Jessica M. and Jones. Following the disclosure, R.M. underwent a number of interviews and counseling and therapy sessions during which she related to social workers, Child Protective

---

**1.** In view of the sensitive nature of this case, this Court will refer to certain individuals by their initials or first name and last initial. *Clifford K. v. Paul S.*, 217 W.Va. 625, 630 n. 1, 619 S.E.2d 138, 143 n. 1 (2005).

Services workers and psychologists various incidents of sexual misconduct perpetrated against her by Jessica M. and Jones.

## II. Procedural Background

In January 2008, an Ohio County grand jury returned separate indictments against Jessica M. and Jones, charging them with committing sexual offenses against R.M.[2] The indictment against Jones set forth six counts of sexual assault in the first degree in violation of *W.Va.Code*, 61–8B–3(a)(2) [1991], and seven counts of sexual abuse by a custodian or parent in violation of *W.Va.Code*, 61–8D–5 [1998]. Those counts charged Jones with a wide variety of acts of sexual misconduct against R.M. over a period of time, when R.M. was age 11 or younger. An additional count charged Jones with conspiracy in violation of *W.Va.Code*, 61–10–31 [1971], alleging that Jones engaged in sexual intercourse or intrusion with R.M., while Jessica M. held R.M. down.

Following a mistrial in June 2009, Jones's second trial began in December 2009. The evidence submitted by the State was graphic. According to that evidence, Jones had been sexually assaulting or sexually abusing R.M. since she was three or four years old. Some of the incidents occurred when Jessica M. was absent from the residence, and some occurred with Jones committing the act while Jessica M. held R.M. down on the bed. The acts attributed to Jones included vaginal and anal penetration of R.M. with Jones's penis, penetration by Jones of R.M. with his fingers and with a stick, oral sex by Jones upon R.M. and oral sex by R.M. upon Jones. In addition, R.M. witnessed Jessica M. and Jones having sex and was exposed to pornographic movies. The evidence of the State included the testimony of Joan Phillips, M.D., of Women and Children's Hospital in Charleston who examined R.M. and found "blunt force penetrating trauma" to R.M.'s vagina. At the time of the December 2009 trial, R.M.,

who testified as a witness for the State, was age ten.

Although Jones did not testify, he called a psychologist to the stand who stated that as a result of excessive interviews by social workers, Child Protective Services workers and other psychologists, it could not be determined whether R.M., a young child, was able to accurately report that sexual offenses were committed against her. In addition, Jones called R.M.'s grandmother and aunt who testified that R.M. never disclosed to them any sexual misconduct by Jones. In addition, Jones called Stephen R. Guertin, M.D., who contested the findings of abnormality found by Dr. Phillips.

At the conclusion of the trial, the jury found Jones guilty of six counts of sexual assault in the first degree, seven counts of sexual abuse by a custodian or parent and one count of conspiracy. Thereafter, the circuit court entered an order denying Jones's post-trial motions and sentencing him to an aggregate penitentiary term of 161 to 355 years.[3] The circuit court reimposed the sentence by order entered on September 30, 2011.

This appeal followed.

## III. Standard of Review

■ Although the assignments of error set forth by Jones require the application of separate and distinct standards of review, we note the following general standard in view of Jones's request for a new trial:

In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous

---

**2.** Jessica M. was ultimately convicted on eleven counts consisting of sexual assault in the first degree, sexual abuse by a custodian or parent, incest and conspiracy. Her convictions and sentence to an aggregate penitentiary term of 101 to 235 years were affirmed by this Court in *State v. Jessica Jane M., supra.*

**3.** The 161 to 355 years consisted of the following consecutive sentences: For six counts of sexual assault in the first degree, not less than 15 nor more than 35 years; for seven counts of sexual abuse by a custodian or parent, not less than 10 nor more than 20 years; and for one count of conspiracy, not less than one nor more than five years.

standard. Questions of law are subject to a de novo review.

Syl. pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000). *See also*, W.Va. R.Crim. P. 33; syl. pt. 1, *State v. Kennedy*, 229 W.Va. 756, 735 S.E.2d 905 (2012).

## IV. Discussion

### A.

### Assignment of Error Relating to *State v. Quinn* and *Barbe v. McBride*

Jones's first assignment of error is that his confrontation and due process rights were violated because he was not permitted to let the jury know that the complaining witness, R.M., made various statements that sexual misconduct had been perpetrated against her by individuals other than Jones. Jones asserts that evidence of R.M.'s statements implicating others should have been admitted at trial as an exception to West Virginia's rape shield statute, *W.Va.Code*, 61–8B–11 [1986]. That statute provides in relevant part:

> In any prosecution under this article in which the victim's lack of consent is based solely on the incapacity to consent because such victim was below a critical age, evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct and reputation evidence of the victim's sexual conduct shall not be admissible.[4]

(footnote added)

Prior to trial, Jones filed notices that he intended to introduce evidence before the jury of R.M.'s past statements implicating others. According to Jones, if R.M.'s statements against others were demonstrably false, the statements would fall outside the

scope and reach of the rape shield statute under this Court's opinion in *State v. Quinn*, 200 W.Va. 432, 490 S.E.2d 34 (1997), and would suggest that R.M.'s statements implicating Jones were also false. In the alternative, according to Jones, if R.M.'s past statements implicating others were demonstrably true, evidence of the statements would be admissible at trial under *Barbe v. McBride*, 521 F.3d 443 (4th Cir.2008), and would provide another explanation for the physical findings of Dr. Phillips, as well as R.M.'s age-inappropriate sexual knowledge and conduct.

The circuit court conducted a hearing on December 3, 2009, and in an order entered on December 11, 2009, ruled that R.M.'s past statements implicating others in sexual misconduct against her would not be admissible under either *Quinn* or *Barbe*.[5]

In *Quinn*, the defendant was convicted of sexual misconduct of a child by a custodian. The child was age five. On appeal, the defendant asserted that the trial court committed error in excluding evidence under the rape shield statute of the child's false statements that sexual misconduct had been committed against her by others. In affirming the conviction, however, this Court, in *Quinn*, agreed with the trial court that the defendant's proffer of denials by alleged perpetrators of the misconduct against the child was insufficient to establish that the child's statements were false.

▮ In so holding, this Court emphasized, in *Quinn*, that requiring "strong and substantial proof" of the actual falsity of an alleged victim's other statements is necessary to reasonably minimize the possibility that evidence which is within the scope of the

---

**4.** In addition to *W.Va.Code*, 61–8B–11 [1986], W.Va. R. Evid. 404(a)(3) [1994], states:

(a) *Character evidence generally.*—Evidence of a person's character or a trait of character is not admissible for the purpose of proving that he or she acted in conformity therewith on a particular occasion, except: * * *

(3) Character of victim of a sexual offense.— In a case charging criminal sexual misconduct, evidence of the victim's past sexual conduct with the defendant as provided for in W.Va. Code § 61–8B–11; and as to the victim's prior sexual conduct with persons other than the defendant, where the court determines at a

hearing out of the presence of the jury that such evidence is specifically related to the act or acts for which the defendant is charged and is necessary to prevent manifest injustice[.]

**5.** As stated above, the criminal convictions of R.M.'s mother were affirmed by this Court in *State v. Jessica Jane M., supra*. In that case, a *per curiam* opinion citing *Quinn* and *Barbe*, we held that the trial court did not abuse its discretion in sustaining the State's objection to the following question posed to R.M. by defense counsel: "How many different men did you have sex with?"

rape shield statute is not erroneously considered outside its scope. 200 W.Va. at 438, 490 S.E.2d at 40; syl. pt. 2, *State v. Wears*, 222 W.Va. 439, 665 S.E.2d 273 (2008). Accordingly, the defense must initially present such evidence of other statements to the court out of the presence of the jury and with fair notice to the prosecution, which presentation may in the court's discretion "be limited to proffer, affidavit, or other method that properly protects both the rights of the defendant and the alleged victim." *id.* Nevertheless, syllabus point 5 of *Quinn* expressed the following caveat:

A determination of the probable falsity of other statements of being the victim of sexual misconduct made by an alleged victim of a sexual offense is not a determination of the admissibility of evidence regarding the statements, nor is it a determination that cross-examination on the other statements must be permitted. A falsity determination means only that evidence regarding the other statements is not to be considered as evidence of an alleged victim's "sexual conduct" within the meaning of our rape shield law, *W.Va.Code*, 61–8B–11 [1986] and *West Virginia Rule of Evidence* 404(a)(3) [1994]. The evidence remains subject to all other applicable evidentiary requirements and considerations. Moreover, in the event that an ultimate determination is made that such evidence is admissible, the State retains the right to seek to rebut or impeach such evidence before the ultimate trier of fact.

By contrast, defense counsel in *Barbe* sought to demonstrate that the child had, in fact, been the victim of sexual misconduct by other men in order to provide an alternative explanation for her psychological profile as an abuse victim. In *Barbe*, the defendant was convicted of a number of sexual offenses in a case where the child testified that the defendant had repeatedly abused her when she was between the ages of four and twelve. The defense, however, was prevented by the trial court from cross-examining the State's expert counselor concerning any sexual misconduct perpetrated against the child by other men. The basis of the trial court's ruling was a *per se* application of this State's rape shield law.

Granting relief in habeas corpus, the Fourth Circuit Court of Appeals, in *Barbe*, confirmed that a state court cannot impose a *per se* rule for disallowing evidence under a rape shield law. Instead, the court must determine, on a case-by-case basis, whether the exclusionary rule is arbitrary or disproportionate to the State's legitimate interests. Concluding that the defendant's right to confront witnesses had been violated, the opinion in *Barbe* states:

In making the Rape Shield Ruling at trial, the state court contravened the *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)–*Michigan v. Lucas*, 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991) [case-by-case assessment] Principle. That is, the circuit court applied a per se exclusionary rule, premised on its conclusion that, because Barbe was not relying on the falsity exception to the rape shield law recognized in *State v. Quinn*, "the rape shield statute applies, period." As the Supreme Court explained in *Lucas*, a court's adoption and application of a per se exclusionary rule—absent consideration of the specific facts of the case, and absent an appropriate assessment of the legitimate competing interests of the accused and the State—constitutes error.

521 F.3d at 458.

■■ Consistent with the *Barbe* opinion's proportionality of interests analysis, and its case-by-case assessment principle, is syllabus point 6 of *State v. Guthrie*, 205 W.Va. 326, 518 S.E.2d 83 (1999), which holds:

The test used to determine whether a trial court's exclusion of proffered evidence under our rape shield law violated a defendant's due process right to a fair trial is (1) whether that testimony was relevant; (2) whether the probative value of the evidence outweighed its prejudicial effect; and (3) whether the State's compelling interests in excluding the evidence outweighed the defendant's right to present relevant evidence supportive of his or her defense. Under the test, we will reverse a trial court's ruling only if there has been a clear abuse of discretion.

*See State v. Jessica Jane M., supra,* 226
W.Va. at 254 n. 16, 700 S.E.2d at 314 n. 16
(associating syl. pt. 6 of *Guthrie* with *Barbe* ).

█ In Jones's November 2009 pre-trial
notice, he set forth ten paragraphs describ-
ing evidence he intended to introduce at trial
under either the *Quinn* or *Barbe* opinions.
Paragraph one alleged that, in March 2003,
R.M. falsely reported inappropriate sexual
contact by her uncle and grandfather. In
March 2003, R.M. was age four. However,
paragraph one referenced a March 6, 2003,
memorandum from the Ohio County Sheriff's
Office which stated that, according to Jessica
M., the incidents occurred in March or April
2002. At that time, R.M. would have been
age three. Moreover, paragraph one stated
that R.M. made the report "because she was
confused by her mother." In paragraph two
of the notice, R.M. falsely implicated foster
mother Sally Keefer and her husband in
inappropriate sexual contact. That para-
graph, however, stated that R.M. said there
was contact "or" that she dreamed that Sally
Keefer and her husband involved her in inap-
propriate sexual contact. Paragraph three
alleged that R.M. had been having dreams,
fantasies and nightmares about her foster
parents having sex. Paragraph three also
alleged that R.M. falsely reported seeing Sal-
ly Keefer's husband in his underwear.

Paragraph four alleged that R.M. reported
that her cousin, Sasha, had inserted a hair
brush into R.M.'s vagina. Paragraph four
referenced a July 18, 2001, medical report
which found "no obvious evidence of genital
trauma." In July 2001, R.M. was age two.
Paragraph five alleged that R.M. falsely re-
ported that she was sexually abused by a
man named Graham. R.M.'s report concern-
ing Graham will be discussed in detail in the
section of this opinion designated Remaining
Assignments of Error.

Jones withdrew paragraphs six and seven
of the pre-trial notice. Paragraph eight al-
leged: "The child has reported that she saw
her former foster sibling 'Wesley' naked.
The child later denied that she saw Wesley
naked or that she made the report." Para-
graph nine alleged that, R.M. reported see-
ing David Burech naked and that he had
intercourse with her. According to that

paragraph, R.M. implicated an additional in-
dividual named "William." That paragraph
further alleged that R.M. also denied that
Burech did anything to her, except spanking
her. Finally, paragraph ten alleged: "R.M.
has reported that she has had sex with her
cousin [C.V.] and was caught in the act."

In the order of December 11, 2009, the
circuit court ruled that the above evidence
would not be admitted at trial. With regard
to Jones's assertion that R.M.'s reports
would be admissible under *Quinn,* the order
stated:

> Defendant has not made the requisite
> showing of "strong or substantial proof"
> that the statements Defendant intends to
> introduce regarding the alleged victim's
> past sexual abuse at the hands of persons
> other than Defendant, are false[.] * * *
> Notably, an evidentiary hearing on this
> matter was initially scheduled for Decem-
> ber 3, 2009 at 9:00 am, but was adjourned
> until 2:00 pm because Defendant was un-
> able to locate the necessary witnesses. At
> the reconvened hearing at 2:00 pm, Defen-
> dant again appeared without any witnesses
> to present in support of his position.
> * * * Unsubstantiated documents, without
> more, are not enough to make the requisite
> showing that the alleged victim's previous
> statements about sexual abuse allegedly
> suffered at the hands of persons other
> than Defendant, are false so as to remove
> those statements from the confines of
> West Virginia's Rape Shield Law.

As to Jones's assertion that certain reports
concerning R.M.'s allegations against others
would be admissible under *Barbe,* the circuit
court found the truth of the allegations to be
speculative. Thus, the order stated that the
circuit court had been unable "to meaningful-
ly balance the interests of the alleged victim
in keeping such allegations/occurrences pri-
vate, with the Defendant's interest in pre-
senting a defense to the serious charges en-
tered against him."

█ The appendix-record reveals that,
notwithstanding the sexual offenses, R.M.
and her siblings were the victims of abuse
and neglect throughout their young lives,
which included exposure to the conduct of

Jessica M. and Jones in the form of drug and alcohol abuse and domestic violence. Some of the reports sought to be admitted under *Quinn* or *Barbe* took place when R.M. was age four, or less. Other reports were largely accounts of R.M.'s symptomatology, or seeing someone without clothing, rather than instances of statements of sexual misconduct by others. A child's dreams, fantasies and nightmares, while important to the counselor or psychologist, do not, of themselves, warrant dissection at trial under the authority of the *Quinn* and *Barbe* decisions. As confirmed in *Quinn,* the Constitution of the United States "does not require confrontation of witnesses with irrelevant evidence." 200 W.Va. at 440 n. 13, 490 S.E.2d at 42 n. 13. Moreover, as recognized in *Barbe,* "a state's interest in protecting sexual abuse victims from harassment, humiliation, and invasion of privacy is especially compelling when the testifying victim is a child." 521 F.3d at 459 n. 21.

We recognize, however, the possibility that some of the evidence Jones sought to introduce could have been elicited at trial from witnesses other than R.M. Moreover, Jones relies heavily on the allegation in paragraph nine that R.M. reported David Burech as having had intercourse with her. R.M. also denied that Burech did anything to her, except spanking her. Nevertheless, if the report implicating Burech were false and, thus, not covered by the rape shield statute, syllabus point 5 of *Quinn* makes clear that the report's falsity is not a determination of automatic admissibility at trial. If the report implicating Burech were true, then the proportionality and case-by-case assessment principles of *Barbe* must come into play. In the current matter, the circuit court was unable to complete the process, under *Barbe,* because it found Jones's evidence to be speculative.

Given the age and history of this child, and the specificity of her statements relating to Jones, this Court is of the opinion that the exclusion of Jones's evidence concerning R.M.'s reports and statements of sexual misconduct committed against her by others was within the court's discretion. This assignment of error is, therefore, without merit.

## B.

### Remaining Assignments of Error

■ Related to the above assignment of error is Jones's assertion that the State violated his right to discovery of exculpatory evidence by failing to provide the identity of the author of a September 14, 2009, report prepared by the Department of Health and Human Resources.[6] According to the report, R.M. made a statement indicating that a man named Graham improperly touched her during an overnight visit in the Graham home. The report concluded, however, that the accusation was false on the basis that R.M. admittedly made the statement because she missed her foster mother and wanted to leave the Graham residence. Except for a reference indicating that Sally Keefer had informed Mrs. Graham that R.M. had implicated other individuals in acts of sexual misconduct in the past, the September 14, 2009, report dealt entirely with the accusation against Mr. Graham. The State provided a copy of the report to Jones on September 15, 2009, prior to his second trial.

The circuit court addressed the report during the December 3, 2009, hearing and in the pre-trial order entered on December 11, 2009. The circuit court concluded that, as an exception to its ruling of inadmissibility under *Quinn,* the false accusation against Mr. Graham would be admissible in Jones's case-in-chief. Noting the State's acknowledgment that the accusation was false, the December 11, 2009, order stated that R.M.'s assertion

---

**6.** Immediately after the return of the indictment, Jones filed an omnibus discovery motion pursuant to Rule 16 of the *West Virginia Rules of Criminal Procedure* which incorporated a demand for exculpatory material. Jones's efforts to obtain discovery were on-going throughout the case and included a request for psychological, medical, school and counseling records pertaining to R.M. Jones also sought to require the State

"to make inquiry of any and all relevant agencies, entities or persons with respect to the existence of material relevant to the charges herein." In July 2008, the circuit court ordered the State to issue a subpoena *duces tecum* upon the Department of Health and Human Resources to secure the production of certain material. In response to the various requests, the State provided thousands of pages of discovery to Jones.

against Mr. Graham "is outside of the scope of the Rape Shield Law and is therefore not precluded under WV Code § 61–8B–11."

However, after ruling the Graham evidence admissible under *Quinn*, R.M. recanted her denial and restated that Mr. Graham had, in fact, improperly touched her. As a result, the circuit court revisited its ruling in an *in camera* hearing conducted during Jones's December 2009 trial. In the *in camera* hearing, the court spoke with R.M. and a child witness who had been present in the room in the Graham residence when the incident allegedly occurred. The two children gave opposite accounts of whether any improper touching of R.M. took place. Concluding that it was impossible to tell whether the incident did or did not occur, the circuit court reversed its earlier ruling and held the Graham evidence inadmissible at trial.

It was during the December 2009 *in camera* hearing that the State provided Jones with the identity of the author of the September 14, 2009, report, *i.e.*, Lori Glover. At that time, the State represented that Ms. Glover was available by telephone.

Jones contends that the failure of the State to timely identify Ms. Glover as the author of the report unfairly deprived him of the ability to call Ms. Glover as a witness at the December 3, 2009, hearing and at trial. Jones maintains that he was, therefore, precluded him pursuing evidence of false accusations, under *Quinn*, with which to impeach R.M.'s testimony.

■ Syllabus point 2 of *State ex rel. Rusen v. Hill*, 193 W.Va. 133, 454 S.E.2d 427 (1994), holds:

> The traditional appellate standard for determining prejudice for discovery violations under Rule 16 of the West Virginia Rules of Criminal Procedure involves a two-pronged analysis: (1) did the non-disclosure surprise the defendant on a material fact, and (2) did it hamper the preparation and presentation of the defendant's case.

Syl. pt. 2, *State v. Smith*, 220 W.Va. 565, 648 S.E.2d 71 (2007). *See also* syl. pt. 2, *State v. Youngblood*, 221 W.Va. 20, 650 S.E.2d 119 (2007).

In this matter, several factors mitigate against a conclusion that reversible error occurred because of the failure to identify Ms. Glover. Though untimely, Ms. Glover was identified during the trial and was represented to be available by telephone. Moreover, according to the September 14, 2009, report, Sally Keefer and Mrs. Graham were the true sources of comments to the effect that R.M. had a history of making false accusations against other individuals. Jones received a copy of the report on September 15, 2009, well in advance of his December 2009 trial. Finally, as to the specific accusation against Mr. Graham, the ultimate conclusion of the circuit court was that admissibility under *Quinn* was not shown because it was impossible to determine whether the accusation was true or false. Consequently, this assignment of error does not warrant the granting of a new trial.

■ Jones next contends that the circuit court committed error in denying his motion for a mistrial when the State's expert witness, Maureen Runyon, testified that, in her opinion, Jones had sexually abused R.M.

During the trial, the State called Maureen Runyon, an expert in the field of social work employed at Women and Children's Hospital in Charleston, who testified about an interview she conducted with R.M. in 2006. During the interview, R.M., age seven, denied that anyone had engaged in sexual misconduct against her. However, according to Runyon, R.M. also stated that, if anyone were to give her sexual touches, she "could tell my mammaw and she would call the cops on Jack." R.M. further said during the interview that she loved Jones and that Jones would buy her gifts and candy. Runyon then testified:

> Q. * * * [T]he fact that [Jones] would buy [R.M.] candy and do these nice things to her, did you bring—come to any conclusion about whether or not she was being perpetrated on?

> A. One of the things that I always say is that we have to look at children and allegations in cases in totality, and when I do that now and I—then, yes, I am of the

opinion that [R.M.] was sexually abused by Jack Jones.

At that point, Jones's counsel moved for a mistrial on the grounds that Runyon's expression of opinion was highly prejudicial and invaded the province of the jury. The motion was denied, and Jones's counsel was permitted to draft a curative instruction. That instruction, given to the jury during Runyon's testimony, stated:

> The Court instructs the jury that the testimony of Maureen Runyon in which she expressed an opinion that Jack Jones sexually abused [R.M.] was completely inappropriate and is not a proper opinion within the area of her expertise. No witness is permitted to express a belief or an opinion that a defendant committed any charged offense. The determination of guilt or innocence is solely a matter to be decided upon by the jury. The jury is instructed that the Court has stricken the matter from the record and that the jury may draw no inference from that testimony and may not consider that testimony in any way in arriving at a conclusion of guilt or innocence. As a matter of law that testimony does not exist.

Moreover, the instructions given to the jury at the end of the trial included the following: "You should disregard, entirely, questions and exhibits to which an objection was sustained or answers and exhibits ordered stricken out of the evidence."

There is no question that Ms. Runyon's comment that Jones sexually abused R.M. was improper. *See* syl. pt. 7, in part, *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990) (Although an expert may offer an opinion based on objective findings that a child has been sexually abused, the expert may not state whether he or she personally believes the child, nor may the expert give an opinion as to whether the sexual misconduct was committed by the defendant.). *See also* syl. pt. 3, *State v. Martin*, 224 W.Va. 577, 687 S.E.2d 360 (2009). Nevertheless, Rule 26.3 of the *West Virginia Rules of Criminal Procedure* states: "Before ordering a mistrial, the court shall provide an opportunity for the state and for each defendant to comment on the propriety of the order, including whether each party consents or objects to a mistrial, and to suggest any alternatives." In this case, the trial transcript demonstrates that Jones's counsel, the prosecutor and the court engaged in an extended discussion concerning whether a mistrial should be declared. Concluding that a mistrial was not warranted, the circuit court gave the curative instruction drafted by defense counsel. As can be seen, the instruction was detailed and manifestly clear.

■ This Court held in syllabus point 18 of *State v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966): "Ordinarily, where objections to questions or evidence by a party are sustained by the trial court during the trial and the jury instructed not to consider such matter, it will not constitute reversible error." *See also Reed v. Wimmer*, 195 W.Va. 199, 208, 465 S.E.2d 199, 208 (1995) (There is a presumption that curative instructions are effective.). Here, Runyon's improper comment did not relate to any specific count of the 14 count indictment under consideration by the jury. Given the volume of evidence placed before the jury over several days of trial and the text of the curative instruction given, this Court is of the opinion that the circuit court's denial of Jones's motion for a mistrial is protected by the parameters of sound discretion. *See* syl. pt. 8, *State v. Davis*, 182 W.Va. 482, 388 S.E.2d 508 (1989) ("The decision to declare a mistrial, discharge the jury, and order a new trial in a criminal case is a matter within the sound discretion of the trial court."). *State v. Thornton*, 228 W.Va. 449, 459, 720 S.E.2d 572, 582 (2011) (The grant or denial of a motion for a mistrial is reviewed under an abuse of discretion standard.).

■ Finally, Jones assigns as error the denial of his post-trial motions concerning certain comments made by the State to the jury during closing argument. Those statements were to the effect that the State had presented "an honest case with honest witnesses" and that the State had not attempted any "shading or spinning" of the facts. A review of the transcript, however, suggests that those comments were neutralized by the State's admonition, also made

during closing, that "no one is entitled to their own facts." We cannot conclude that the circuit court abused its discretion in denying Jones's post-trial motions in that regard. Syllabus point 3 of *State v. Boggs*, 103 W.Va. 641, 138 S.E. 321 (1927), holds:

> The discretion of the trial court in ruling on the propriety of argument by counsel before the jury will not be interfered with by the appellate court, unless it appears that the rights of the complaining party have been prejudiced, or that manifest injustice resulted therefrom.

Syl. pt. 3, *State v. Graham*, 208 W.Va. 463, 541 S.E.2d 341 (2000).

### V.  Conclusion

Having found the assignments of error to be without merit, this Court affirms Jones's criminal convictions as well as his penitentiary sentence set forth in the September 30, 2011, order of the Circuit Court of Ohio County.

**Affirmed.**

Justice DAVIS dissents and reserves the right to file a dissenting opinion.

DAVIS, J., dissenting:

The majority affirmed the defendant's convictions for sexual offenses against his girlfriend's adolescent daughter. In doing so, the majority's opinion affirmed the trial court's ruling prohibiting the defendant from presenting evidence that the alleged victim previously had falsely accused at least twelve other people of sexual misconduct toward her. Because I believe the defendant had a constitutional right, under the facts of this case, to inform the jury that the alleged victim previously had made numerous, unfounded allegations of sexual misconduct by other people, I dissent.[1]

### The Defendant's Constitutional Right to Confront His Accuser Was Violated

"Probably no one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing false-hood and bringing out the truth in the trial of a criminal case." *Pointer v. Texas*, 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). Indeed, "[t]he right to confront and to cross-examine witnesses is primarily a functional right that promotes reliability in criminal trials." *Lee v. Illinois*, 476 U.S. 530, 540, 106 S.Ct. 2056, 2062, 90 L.Ed.2d 514 (1986). For this reason, the United States Supreme Court scrupulously has guarded against "restrictions imposed by law or by the trial court on the scope of cross-examination." *Delaware v. Fensterer*, 474 U.S. 15, 18, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985). In fact, the Confrontation Clause of the Sixth Amendment of the United States Constitution guarantees a criminal defendant the right to be confronted with the witnesses against him or her. Moreover, the Supreme Court has held that the rights under the Confrontation Clause mean more than merely being allowed to confront a witness physically. In *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987), the Court held that "[t]he Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." *See also Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965) ("[A] primary interest secured by [the Confrontation Clause] is the right of cross-examination."). The critical importance of cross-examination has been set out as follows:

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit, the witness.... A more particular attack on the witness' credibility is effected by means of

---

1. I wish to be perfectly clear. This case was not about informing the jury that the alleged victim actually had engaged in sexual relations with others. The *sole issue* in this case was informing the jury that the alleged victim previously had made numerous, unfounded sexual misconduct allegations against others.

cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony. *Davis v. Alaska,* 415 U.S. 308, 315–17, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (internal quotations and citations omitted). *See also Maryland v. Craig,* 497 U.S. 836, 845, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."); *Pointer v. Texas,* 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965) ("There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.").

The decision in *Davis* illustrates the problem of denying a defendant the right to cross-examine a key witness with relevant evidence that attacks the witness' credibility. The defendant in *Davis* was convicted of burglary and grand larceny. During the trial, the court refused to allow the defendant to cross-examine a key prosecution witness about the witness' probation status following an adjudication of juvenile delinquency. The trial court found that, under the state's laws, such evidence was not admissible. The Supreme Court reversed the conviction upon finding the defendant's rights under the Confrontation Clause were violated:

> In the instant case, defense counsel sought to show the existence of possible bias and prejudice of Green, causing him to make a faulty initial identification of petitioner, which in turn could have affected his later in-court identification of petitioner.
>
> We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on Green's testimony which provided a crucial link in the proof ... of petitioner's act. The accuracy and truthfulness of Green's testimony were key elements in the State's case against petitioner....
>
> ....
>
> [P]etitioner sought to introduce evidence of Green's probation for the purpose of suggesting that Green was biased and, therefore, that his testimony was either not to be believed in his identification of petitioner or at least very carefully considered in that light. Serious damage to the strength of the State's case would have been a real possibility had petitioner been allowed to pursue this line of inquiry. In this setting we conclude that the right of confrontation is paramount to the State's policy of protecting a juvenile offender. Whatever temporary embarrassment might result to Green or his family by disclosure of his juvenile record ... is outweighed by petitioner's right to probe into the influence of possible bias in the testimony of a crucial identification witness.

*Davis,* 415 U.S. at 317–19, 94 S.Ct. at 1110–12, 39 L.Ed.2d 347. *See Olden v. Kentucky,* 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988) (per curiam) (holding that trial court's refusal to allow defendant to impeach victim's testimony by cross-examining victim about possible motive to lie deprived defendant of his right to confrontation); *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) (precluding defendant from questioning witness about State's dismissal of pending public drunkenness charge against him and concluding that, "[b]y thus cutting off all questioning about an event ... that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony," the trial court's ruling violated the defendant's rights under the Confrontation Clause).

The decision in *Davis* illustrates the Supreme Court's general guidelines for enforcing the Confrontation Clause in the context of limiting cross-examination of a testifying witness. Federal courts of appeal have addressed the more specific issue of denying a defendant the right to cross-examine a sexual assault victim regarding her prior unfounded allegations of sexual misconduct by others. In *Redmond v. Kingston*, 240 F.3d 590 (7th Cir.2001), the defendant was convicted by a Wisconsin jury of sexually assaulting a fifteen-year-old victim. During the trial, the defendant was denied the right to confront the victim concerning a prior unfounded claim that she had been forcibly raped by another person. In a habeas corpus appeal to the Seventh Circuit Court of Appeals, the defendant argued that the trial court's restrictions on his cross-examination of the victim violated his rights under the Confrontation Clause. The Seventh Circuit agreed:

> The evidence . . . was not cumulative, or otherwise peripheral, considering that testimony by [the victim] was virtually the only evidence of Redmond's guilt that the prosecution had. . . . The only evidence that was relevant to her credibility in Redmond's case . . . was that within the preceding year she had made up a story about being forcibly raped. Whether or not she had had sex with the alleged rapist was irrelevant, since Redmond was not prepared to try to prove that she had not. For unexplained reasons the Wisconsin court of appeals thought that if Redmond's lawyer had been permitted to ask [the victim] whether she had ever made a false charge of forcible sexual assault, the door would have been opened to an inquiry into whether she had had sex on that occasion at all. We cannot think of any reason why
> . . .
> And thus the court's ruling, though ostensibly based on the rape-shield statute, derives no support from that statute. The statute protects complaining witnesses in rape cases (including statutory-rape cases) from being questioned about their sexual conduct, but a false charge of rape is not sexual conduct. . . . The false-charge "exception" to the rape-shield statute is not really an exception, but rather a reminder of the limited meaning of "sexual conduct" as defined in the statute. The only basis for the court's ruling was the general principle of the law of evidence . . . that relevant evidence may be excluded if its probative value is substantially outweighed by its prejudicial (confusing, or cumulative) effect. When that unexceptionable rule is applied as it was here to exclude highly probative . . . evidence tendered by a criminal defendant that is vital to the central issue in the case ( [the victim's] credibility), the defendant's constitutional right of confrontation has been infringed. . . . .

*Redmond*, 240 F.3d at 592 (internal citations omitted). *See also Sussman v. Jenkins*, 636 F.3d 329, 357 (7th Cir.2011) (applying *Redmond* and holding: "The jury reasonably could have concluded that [the victim] was prone to use allegations of sexual abuse against father figures as a means either of gaining their attention or as a means of punishing them for abandoning him."); *Kittelson v. Dretke*, 426 F.3d 306, 322–23 (5th Cir.2005) (following *Redmond* and holding: "In a case that turned entirely on the credibility of the complaining witness, the state courts' restriction on Kittelson's ability to challenge that credibility violated his clearly-established confrontation and due process rights and cannot be considered harmless.").

In *White v. Coplan*, 399 F.3d 18 (1st Cir. 2005), a New Hampshire jury convicted the defendant of three counts of sexual assault against two young girls. At trial, the defendant was forbidden to offer evidence that both girls had previously made such accusations against other persons. In his habeas corpus appeal to the First Circuit Court of Appeals, the defendant argued that this restriction violated his Confrontation Clause rights. The First Circuit agreed:

> In this case, White's evidence was not merely "general" credibility evidence. . . .
> The evidence in this case was considerably more powerful. The past accusations were about sexual assaults, not lies on other subjects; and while sexual assaults may have some generic similarity, here the past accusations by the girls bore a close resemblance to the girls' present testimo-

ny—in one case markedly so. In this regard the evidence of prior allegations is unusual.

If the prior accusations were false, it suggests a pattern and a pattern suggests an underlying motive (although without pinpointing its precise character).... Many jurors would regard a set of similar past charges by the girls, if shown to be false, as very potent proof in White's favor.

This "if," of course, is the heart of the matter. If the witness were [sic] prepared to admit on the stand that a prior accusation of similar nature was false, it is hard to imagine good reason for excluding the evidence. Prior admitted lies of the same kind in similar circumstances could powerfully discredit the witness....

. . . .

White was accused of serious crimes—witness his sentence—and virtually everything turned on whether the two girls were to be believed. White had almost no way to defend himself except by impeachment.... [C]ross-examination to show prior similar accusations by the girls ... could easily have changed the outcome.

Evidence suggesting a motive to lie has long been regarded as powerful evidence undermining credibility, and its importance has been stressed in Supreme Court confrontation cases.... In our case the nature of the motive may be unknown; but if the prior accusations are similar enough to the present ones and shown to be false, a motive can be inferred and from it a plausible doubt or disbelief as to the witness' present testimony.

*White*, 399 F.3d at 24–26 (internal citations omitted). *But see Jordan v. Warden, Lebanon Corr. Inst.*, 675 F.3d 586 (6th Cir.2012) (finding no constitutional violation); *Piscopo*

*v. Michigan*, 479 Fed.Appx. 698 (6th Cir. 2012) (same); *Abram v. Gerry*, 672 F.3d 45 (1st Cir.2012) (same); *United States v. Frederick*, 683 F.3d 913 (8th Cir.2012) (same); *United States v. Tail*, 459 F.3d 854 (8th Cir.2006) (same); *Boggs v. Collins*, 226 F.3d 728, 740 (6th Cir.2000).

In the instant case, the majority opinion found that the defendant failed to meet the standard of proof required to introduce evidence that the alleged victim previously had falsely accused other persons of sexual misconduct against her. The standard of proof required to introduce such evidence was set out in *State v. Quinn*, 200 W.Va. 432, 490 S.E.2d 34 (1997). Under *Quinn*, the defendant had to establish by *"strong and substantial proof* ... the actual falsity of an alleged victim's other statements[.]" Syl. pt. 2, in part, *id.* (emphasis added). I believe the defendant met his burden of proof under *Quinn*. I also believe that the majority opinion superimposed a higher burden than what is required by *Quinn*, and this heightened standard violated the defendant's rights under the Confrontation Clause.[2]

Under the decision in *Quinn*,

"[a] defendant who wishes to cross-examine an alleged victim of a sexual offense about or otherwise introduce evidence about other statements that the alleged victim has made about being the victim of sexual misconduct must initially present evidence regarding the statements to the court out of the presence of the jury and with fair notice to the prosecution, which presentation may in the court's discretion be limited to proffer, affidavit, or other method[.]"

Syl. pt 3, in part, *Quinn*, 200 W.Va. 432, 490 S.E.2d 34. In the instant case the defen-

2. In determining whether restrictions on cross-examination violate the Confrontation Clause, courts look at: (1) whether the excluded evidence was relevant; (2) whether there were other legitimate interests outweighing the defendant's interest in presenting the evidence; and (3) whether the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness. *United States v. Larson*, 495 F.3d 1094, 1103 (9th Cir.2007). *See United States v. Roussel*, 705 F.3d 184, 194 (5th Cir. 2013) ("The Sixth Amendment's Confrontation

Clause is violated if the defendant [can] show that a reasonable jury might have had a significantly different impression of the witness's credibility if defense counsel had been allowed to pursue the questioning." (internal quotations and citation omitted)); *Ortiz v. Yates*, 704 F.3d 1026, 1037 (9th Cir.2012) ("The whole point of the effective, permissible cross-examination protected by the Confrontation Clause is to diminish the witness' credibility with the jury and thereby render a conviction less likely.").

dant's brief indicated he submitted the following proffer of the falsity of the victim's prior allegations against others:

1. The child, . . ., falsely reported that she was subjected to inappropriate sexual contact by [C.M.], III and [C.M.], IV. *The child has admitted to a mental health professional that the reports were false* claiming that she made the reports because she was confused by her mother. [D.H.H.R. Assessment dated 3/23/03 at p. 2]. *An investigation was conducted by the Ohio County Sheriffs office and by D.H.H.R. and found these reports to be unsubstantiated.*

2. The child, . . ., falsely reported that she was subjected to inappropriate sexual contact by both [S.K.] and her husband, [P.K.], or that she dreamed of inappropriate sexual contact with [S.K.] and her husband, [P.K.]. *The child has admitted to a mental health professional that the reports were false. An investigation by D.H.H.R. found the reports to be unsubstantiated.* There are numerous reports by [the child's mother] of dream sexual assaults including early reports by [the victim] that the sexual assaults by Jack [J.] were dreams. Moreover, the child has reported to [her mother] that she dreamed that she was sexually assaulted by Lt. [C.] during his interview of the child. [Taped interview of Jack [J.] by Lt. [C.], interviews of [the mother], [M. M], and [M. M.]].

A. The Child and Adolescent Needs and Strengths and Comprehensive Multisystem Assessment dated 2/28/07 contains the following language:

"This placement was disrupted when [the alleged victim] began to fantasize that her foster parents were going to have sexual intercourse in front of her and then involve her in the act. [The alleged victim] also began to have sexual dreams where her foster mother was having sex with numerous men." (P.3)

B. "Clear evidence of antisocial behavior including but not limited to lying, stealing, manipulating others, sexual aggression, violence towards people, property or animals." [P. 11].

C. "[The alleged victim] has fantasized that her former foster parents were going to sexually abuse her. She most recently was having dreams that her foster mother was having sex with other men (like she witnessed her mother doing) and was going to also include [the alleged victim] in the act." (P. 18).

D. "Since [the alleged victim] has been in placement at Pomegrante, she disclosed that while living in the home of her biological mother, she sexually assaulted an infant, male cousin by inserting a coat hanger in his penis. This happened in her bedroom. When she couldn't get the hanger out, the baby began crying and she yanked it out, put his diaper back on, and went downstairs." (p.18).

3. The Section II, Designated Individual Case Reviewer report dated 8/7/2007 contains the following language:

A. "[The alleged victim] has fantasized that her former foster parents were going to sexually abuse her. She most recently was having dreams that her foster mother was having sex with other men (like she witnessed her mother doing) and was going to also include [the alleged victim] in the act." (p. 13).

B. The child reports sexually oriented nightmares at the [K.] residence on pp. 18–19.

C. "According to information obtained through this reviewer's interview with [S.K.], [the alleged victim] had been having some bizarre dreams, thoughts, and behaviors about two weeks prior to her removal from the [K.] home. [The alleged victim's] bizarre behaviors allegedly started when Mr. and Mrs. [K.] were sitting next to each other on the couch in the living room with [the alleged victim] also being in the room with them. [The alleged victim] reportedly began to get very nervous and anxious that [Mr. and Mrs. K.] were going to have sex and make her watch/participate. Around the same time, [the alleged victim] began to report having dreams that involved [S.K.] having sex with numerous men. [The alleged vic-

tim] went to school one day and told school personnel that she had seen Mr. [K.] in his underwear. The school called [S.K.] regard to this. Sally adamantly denied that this could have happened as her husband is a long-distance truck driver and is only home on weekends. She was positive [the alleged victim] had never seen him dressed inappropriately." (p. 21).

4. The child, has reported that her cousin, . . ., inserted a hair brush into her vagina. The report is memorialized in the medical records of Dr. Romano for 7/18/01 with a report of "no obvious evidence of genital trauma." Further details of the report provided by [relatives of the alleged victim]; report mentioned in D.H.H.R. Assessment dated 3/23/03 at p. 2.

5. The child, . . ., has *falsely reported that she was sexually abused by [John G.]. [The alleged victim] has admitted that the report was false.* [D.H.H.R. report of September 14, 2009 at pages 1 & 5]. An initial recorded interview at Harmony House resulted in the alleged victim stating that the report was false. In a later unrecorded interview by Linda Reeves, the child reportedly claimed that the report was true. [J.G.] and an eyewitness both deny that the report is true. In an agreed upon in camera interview by the Court, [the alleged victim] stated that the report was true while the eyewitness denied the truth of the report.

6. The child, . . ., has *falsely reported that she was sexually abused by various men on at least three occasions.* [D.H.H.R. report of September 14, 2009 at pages 3 & 5].

7. The child, . . ., has *falsely reported that she was sexually abused by [P.K.],* a grandfather and a principal. [D.H.H.R. report of September 14, 2009 at page 4].

8. *The child has reported that she saw her former foster sibling . . . naked. The child later denied that she saw [her former foster sibling] naked or that she made the report.* [February 9, 2009 report of Solutions Outpatient Services].

9. The alleged victim has reported that she saw [D.B.] naked. [S.K.'s notes on page 1]. *The alleged victim has also reported that [D.B.] had intercourse with her.* [S.K.'s notes for Nov. 22, 2006; Pomegrante Report p. 9/33]. The report that [W.] and [D.B.] had sex with [the alleged victim] touched [sic] upon in the interview by Linda Reeves. *The alleged victim denied that [D.B.] did anything to her except spanking her in that interview.* [Hogan interview at pp. 10 & 12.].

10. The alleged victim has reported that she has had sex with her cousin . . . and was caught in the act. [Pomegrante Report p. 27/33].

(Emphasis added).

The above evidence submitted to the trial court shows that the victim alleged sexual misconduct against: (1) C.M., III, and C.M., IV, which was found to be unsubstantiated by a local sheriff and DHHR; (2) S.K. and P.K., which was found to be unsubstantiated by DHHR; (3) a cousin, which was found to be medically unsubstantiated; (4) social worker J.G., which was later retracted, then reaffirmed, then retracted, then reaffirmed; (5) three unnamed men; (6) a foster sibling W.; (7) D.B.; and (8) a second cousin In total, the defendant presented evidence that the alleged victim has accused at least twelve different people of engaging in sexual misconduct with her.

The majority opinion held that the defendant failed to prove that the twelve people did not engage in sexual misconduct with the alleged victim. Such a finding is disturbing. The defendant in this case was able to submit credible evidence, that was documented in DHHR reports, that law enforcement and DHHR had investigated many of the allegations by the alleged victim and found them unsubstantiated.

To the extent that the defendant's proffer was insufficient, the only way that he could satisfy the majority's interpretation of the "strong and substantial proof" requirement would be to provide the trial court with judgments of acquittal of the other persons accused of sexual misconduct by the alleged victim. This heightened standard is unconscionable and violated the defendant's consti-

tutional right of confrontation.[3] I do not make this assessment lightly. The Fourth Circuit reviewed this Court's opinion in *Quinn* in a habeas corpus proceeding. Although the Fourth Circuit affirmed *Quinn*, it did so by expressly noting that it did "not address the broader issue of whether West Virginia's standard of strong and substantial proof of falsity is objectively reasonable in light of relevant Supreme Court precedent." *Quinn v. Haynes*, 234 F.3d 837, 847 (4th Cir.2000). I submit that the standard of "strong and substantial proof," as interpreted in this case by the majority opinion, is not objectively reasonable under the decisions of the United States Supreme Court. The defendant in this case sought "to expose to the jury the facts from which [the] jurors ... could appropriately draw inferences relating to the reliability of the [victim]." *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986) (internal quotations and citation omitted). *See also Berger v. California*, 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508 (1969) ("[O]ne of the important objects of the right of confrontation was to guarantee that the fact finder had an adequate opportunity to assess the credibility of witnesses."). However, because the trial court prohibited cross-examination of the alleged victim concerning prior unfounded allegations of sexual misconduct by others, "[t]he jury was essentially misled, by the empty gesture of cross-examination, to believe that the defense attorney had been permitted to use all the tools at his disposal to expose weaknesses in [the alleged victim's] testimony." *Van Arsdall*, 475 U.S. at 688, 106 S.Ct. at 1440, 89 L.Ed.2d 674.

In the final analysis, I agree with the dissenting opinion in *Abram v. Gerry*, 672 F.3d 45(1st Cir.2012):

> The specter of an adult, particularly one in a position of trust ..., sexually abusing [a] minor [child] is enough to incense even the most equanimous person and to wish upon such a miscreant the full retributive weight of the law. But there lies the catch: the law. We live in an ordered society, and to keep it ordered for the benefit of the whole of society, we are bound to apply the law, not just to do what we believe the abominable person charged may justly deserve.

*Abram*, 672 F.3d at 53 (Torruella, J., dissenting). In view of the foregoing, I respectfully dissent.

---

3. The unconscionability of this heightened standard is found in the fact that the prosecutor did not bring charges against any of the other persons falsely accused by the alleged victim—thus it was impossible for the defendant to submit judgments of acquittal.